## IN RE ASSESSMENT OF TAXES, C. W. BOOTH.

### APPEAL FROM TAX APPEAL COURT, HONOLULU.

SUBMITTED FEBRUARY 29, 1904.      DECIDED APRIL 13, 1904.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

If land with water rights appurtenant thereto and used solely in connection therewith, is assessed in full, including whatever added value it has by reason of such water rights when used solely in connection therewith, such water rights cannot be further assessed apart from the land, as to the whole or a part of their value, even if they may be worth more for other purposes than when used in connection with the lands to which they are appurtenant, and even if the land with such water rights might have been assessed higher because of the other purposes to which the water could be applied, and even if the water rights could be assessed separately if they had not been included in the land.

OPINION OF THE COURT BY FREAR, C.J.

(Galbraith, J., dissenting.)

The tax-payer returned nearly fifty pieces of kula, taro, pasture, vegetable, mountainous and residence lands in Pauoa, Honolulu. The assessor increased a number of the valuations. The Tax Appeal Court sustained some and not others of those increases. The assessor added a new item—"⅔ water rights Pauoa Valley, $100,000", which the Tax Appeal Court disallowed, whereupon the assessor brought this appeal. The "⅔ water rights Pauoa Valley" consists of the aggregate of the water rights appurtenant to the lands, particularly the taro lands, returned as above mentioned, and of no other water

rights.  The water comes from two springs, the site of one of which is owned by this tax-payer.  The various lands supplied by one of the springs are respectively entitled to water during certain hours once in seven days and those supplied from the other spring are respectively entitled to water during certain hours once in nine days.  The insertion of this item by the assessor was based mainly on the fact that this tax-payer and others, who were interested in the remaining third of the water rights in Pauoa Valley, nearly succeeded in getting a bill through the legislature, a few months after the date as of which this assessment was made, appropriating $150,000 for the purchase of all the water rights in the valley, the sites of these springs, rights of way for pipe lines, sites for reservoirs, etc., as an addition to the Honolulu water works and water supply. The reasoning was that if all were worth $150,000, the appellee's two-thirds were worth $100,000.

The tax-payer valued the lands as including these appurtenant water rights.  The assessor assessed them as such.  The Tax Appeal Court likewise fixed the values of such of the lands as were questioned on the appeal as including the water rights and said in its opinion that at the values fixed the tax-payer "is taxed fairly and even high."

Whether water rights that are solely appurtenant to and used in connection with particular lands may be assessed separately or not, it is unnecessary to say.  No doubt such water rights may be more valuable for other purposes than for those to which they are applied, just as a town lot used as a pasture for the time being may be valued as suitable for agricultural or residence or business purposes.  But when water rights are appurtenant to particular lands and used solely in connection with those lands and the lands are returned and assessed as including those rights, the latter cannot be further assessed separately for the surplus of value, if any, not so included, much less for their whole value.

There is perhaps another difficulty in the way of sustaining this assessment and that is that there is nothing to indicate what

surplus value, if any, of the water rights was not included in the assessment of the land. That the entire value of the water rights. alone was not $100,000 is clear. If we leave out of account the Governor's strong condemnation of the proposed bill in his veto message and other circumstances that tend to weaken the evidence adduced in support of the valuation contended for, and assume that all the evidence was not only admissible but entitled to consideration at its face value, still the proposed appropriation was not for the purchase, for $100,000, of these two-thirds of the water rights, which were available only in small fractions on many different particular lands at many different fixed times, but was for the purchase, for $150,000, of all the water rights with complete control and the power to use the water when and where and in what quantities desired, also for rights of way for pipe lines and for reservoir sites, and the sites of the springs, with the right to increase the outflow by tunneling or otherwise, and all for the purposes of the city water supply, to which use no private purchaser could put the water. The two thirds alone not being worth $100,000 and there being no direct evidence showing what they were worth and a considerable portion at least of their value being included in the assessed value of the lands, it would be mostly guess-work to attempt to say how much or even whether any of their value was not included in that of the lands. But, however that may be, these rights cannot be assessed as to a portion of their value as part of the lands and as to the rest separately when they are all appurtenant to the lands and used solely in connection therewith.

The judgment of the Tax Appeal Court is affirmed.

*Robertson & Wilder* for the assessor.

*J. A. Magoon* and *J. Lightfoot* for the tax-payer.

### CONCURRING OPINION OF PERRY, J.

The assessment of $100,000 was based solely on the fact that the tax-payer offered to sell to the Territory his two thirds of the water rights for that sum and that a large number of the

legislators, both in the Senate and in the House of Representatives, voted in favor of the passage of a bill providing for the purchase of all the water rights for $150,000. A number of reports or letters from experts, addressed to Booth and submitted to the legislature concerning the quantity and quality of the water in question and the altitude at which the springs are situated and a petition from citizens requesting the legislature to acquire the water rights for "such sum as shall be satisfactory" to the owners "and just to the government", received in evidence by the Tax Court, are also relied upon to a certain extent, but, assuming that they were admissible in evidence as admissions by Booth of those facts, they are of no practical value in the consideration of the inquiry as to the cash value of the rights.

Booth's offer to sell was not accepted by the Territory. It is immaterial in this connection that the bill failed to pass by one vote only. There was no agreement by the Territory to purchase for $150,000 or for any other sum. That one offers to sell property at a certain price, while it may be strong evidence that the value of the property is not greater than the amount named, is at best extremely weak evidence that the value is as much as that amount. Owners often ask for their property more than it is reasonably worth, sometimes in good faith; but in the absence of an acceptance at the price named, the mere asking is not an indication of what the property will bring if sold.

The contention that the fact that certain members of the two legislative bodies voted in favor of the measure referred to is evidence of the opinions of those members that Booth's water rights, two thirds of the whole, were of the value of $100,000, cannot be sustained. If the evidence showing the action of the legislators was admissible at all, the most that it shows is that those members were of the opinion that the rights, if *all* could be acquired so as to give the Territory the right to the *continuous* flow of *all* the water, were, together with the rights of way for pipe lines, etc., of the value of $150,000; but this does not

tend to show that they were of the opinion that Booth's rights alone, which, as above shown, were not of a continuous flow, were of the value of $100,000, even though, if they could be altered to a continuous right, they would be the equivalent, as to quantity of water, of two thirds of the whole. The evidence, however, was not, in my opinion, admissible. There was no opportunity for cross-examining the legislators. Upon what knowledge or information or facts were their opinions based? Were they based upon the opinions of others? What weight were the opinions of the members entitled to? Was the sum of $150,000 named in the bill because that was believed to be the full cash value of the water rights or because, the full cash value being admittedly less, considerations of public policy were nevertheless deemed to justify or require the purchase? These are material questions with reference to which the legislators were not subjected to cross-examination.

There is no other evidence, nor is it even claimed that there is any, tending to show that Booth's water rights are of any value greater than that included in the valuation of the thirty-five parcels of land to which they are appurtenant. The Tax Court found that, tested by the full cash value, the assessments of those parcels, inclusive of the water rights, are fair and even high. Conjecture need not be resorted to in order to ascertain the correctness of that finding. Booth testified that the valuations returned by him were based on the rental value of the parcels as wet lands. Not only is that evidence undisputed, but the assessor himself testified that his assessments also were based on the revenue and productiveness of the lands as wet lands and on the value of neighboring property of the same character.

The opinion of the Chief Justice, except as modified in the foregoing, I concur in.

### DISSENTING OPINION BY GALBRAITH, J.

It appears that there are numerous water springs near the head of Pauoa Valley but that the source of its principal water

supply is two particular springs: that one of these is located on the tax-payer's land and the other on the land of another but the tax-payer owns such an interest in the latter 'as gives him the ownership of two-thirds interest of the two springs: that the tax-payer also owns considerable land in Pauoa Valley which he returns for taxation at no higher valuation than the adjoining lands of others who claim no interest or right in these springs other than the common water rights appurtenant to their respective lands.

It is not denied that the taxpayer made a vigorous effort during the session of the Territorial legislature commencing on February 18, 1903, and closing April 28, 1903, to effect a sale of his rights in the water of these two springs for $150,000, and would have succeeded in so doing but for the veto of the Governor and the failure to control the votes, lacking one, in the Senate necessary to pass the measure over the Governor's veto. In the absence of any evidence to the contrary the assessor had a right to assume that the tax-payer's interest in this water privilege was as valuable on the first day of January, 1904, as it was at the close of the legislative session in April prior thereto. Acting upon that presumption he had a right to place the valuation of $100,000 on this property, the same valuation placed thereon by the tax-payer when he wanted to transfer it to the public.

The tax-payer's dominion over these two springs and the water flowing therefrom is property separate and distinct from the water rights appurtenant to the lands in the valley below. The latter right has no value except the use that may be made of it in connection with the land to which it is appurtenant. Therefore its value may properly be included in the assessment of the land. The property in the springs, however, has a specific value in itself. It is of great value for uses entirely independent of the cultivation of land, for instance, in supplying the community with water for domestic and other purposes and for this reason may be valuable as specific property for taxation purposes separate and apart from the land. The fact that such

use is possible in this instance, by reason of the location of the springs in close proximity to Honolulu and the pressing need for a suitable water supply for domestic purposes here, does not in the least lessen the value of the taxpayer's property in these springs.

The absurdity of the claim that the value of the property in these springs was estimated and included in the value of the land as approved by the Tax Appeal Court is apparent when it is remembered that the assessment includes many separate tracts of land, aggregating about sixty acres altogether, and the sum of the valuations is only $43,750, less than one half of the value placed on the interest of the tax-payer in the water privilege alone. The assessor in my opinion, should be commended for taking the tax-payer seriously in his dealing with the Territory through its legislature, and holding that the property had the same value for taxation purposes as it was claimed to have by the taxpayer when offered for sale to the Territory.

This court ought to presume that the legislature, a co-ordinate branch of the government, was acting in good faith in dealing with this question and in expressing its willingness to purchase Mr. Booth's rights in the water privilege in the two springs, two thirds of which he claims to own and had a right to dispose of absolutely, for $150,000 of the public fund. This court has no right to presume such perfidy on the part of the legislative assembly as the contention of the tax-payer implies.

What was this property or water privilege that the assessor has valued at $100,000 and that is claimed by the tax-payer to be included in the value of his lands assessed at $43,750?

The Senate committee having the bill in charge looking to the purchase of Mr. Booth's right in the springs, in their report to the Senate, among other things, say: "We have personally examined these springs and find from measurements made by several engineers that there are about 1,100,000 gallons of water flowing daily. This measurement was made in the latter part of the month of March, and the month previous to the month of

March have been very dry so the measurements made indicate the lowest flow obtainable from the springs."

The report of an engineer, presumably made at the instance of Mr. Booth, reads in part as follows: "Measurement taken at the mouth of two perpetual streams, the sources of which are two springs, at an elevation between 550 and 600 feet, situated in Pauoa Valley, about two miles mauka of the terminus of the Pacific Heights Railroad. The springs are not affected by the act of rain-fall, giving an output of 859,920 gallons in twenty-four hours, and by developing can be increased, by conservative estimate, to ten times this amount. Measurement taken from a stream at an elevation of 250 feet, in the same valley, lower down, the source of which stream is several small streams, gives an output of 253,700 gallons per twenty four hours. These springs are all located in Pauoa Valley, which is a natural watershed and would be a valuable reservoir site for the government."

The report of another engineer to Mr. Booth relative to the value of these springs, reads in part as follows: "1. From a close observation it is my opinion that the Pauoa springs represent but a very small portion of the underground flow, having its source in the interior of the island where a large area of permeable ground receives the copious rain-fall of that higher altitude which being filtered and collected in its passage to the lower levels a small portion of said flow is forced to the surface through favorable conditions occurring in the rock under the Pauoa Valley. 2. That the volume of the outflow of these springs can be greatly increased by proper development, say, tunneling, as has been clearly demonstrated by engineering experience in other localities where similar conditions exist. 3. That the fact that these springs are not affected by drouth or flood is evidence of their supply from a subterranean source. As to their desirability as a water supply for the city of Honolulu, I beg to submit the following:

"1. Purity of water as shown by medical analysis.

"2. They being at such an elevation (about 600 feet) above

the sea level, and such a short distance from the center of the
city.

"3.   The simple and inexpensive manner in which the water
can be conveyed to a point available for distribution by a pipe
line on the northerly slope of Tantalus Ridge without expen-
sive trestle work or tunneling.

"4.   Said water can be brought to a small reservoir on a
point of the ridge, say 200 feet above Punchbowl Hill (the wa-
ter to this point need not be conveyed under pressure) and
dropped from this to a lower distributing reservoir, thus fur-
nishing power to an electric plan before final utilization for do-
mestic and other city purposes."

Among numerous witnesses certifying to the virtue and
value of these springs are a number of physicians and surgeons,
one of these says:

"Every city endeavors to put before its populace the best
water available and Honolulu may be regarded as especially
fortunate in this respect inasmuch as right above, say within
two miles of the center and at an elevation covering the most
important sections of the city, there is sufficient spring water
of a purity impossible to excel and unaffected in quantity
through the change of seasons.   I refer to the Pauoa Springs,
the medical analysis of which is attached herewith, subjected to
direct bacteriological examination it reveals no pathognomonic
bacterio or micro-organism.   From a medical standpoint this
water supply can be converted into an ideal system, and there
is no doubt in my mind that the matter will meet with the ap-
proval of our legislators."

Aside from the probative force of the foregoing evidence,
and much more to the same effect, tending to show the value of
the right claimed in these two springs, the tax-payer by present-
ing and urging it before the legislative committees and the public
gave it the additional weight of his approval and indorsement.
So vigorously and persistently did he press the matter upon the
attention of the legislature that the great majority of the peo-
ple's representatives in the legislative assembly accepted his
view of the desirability and value of his rights in these springs
and the sale failed through a very slight margin.   I must as-
sume that Mr. Booth was acting in good faith with the legis-

lature and intended to give the Territory something of value for the expected one hundred and fifty thousand dollars and that his rights and privileges in these springs have the same value for taxation purposes that he represented them to have when he appeared before the legislature as a purveyor of them. By his conduct Mr. Booth has rendered it entirely unnecessary for this court to speculate or to attempt to apply some set rule to the facts in order to ascertain the "full cash value" of this property. We should assume that he placed the "full cash value" on it himself when he attempted to sell it to the Territory first for $250,000 and later for $150,000. Under the facts of this case the doctrine of estoppel, or common honesty, ought to close the mouth of the tax-payer and forbid him to question the valuation made of this property by the assessor.

It does not seem to me that Mr. Booth has any just cause of complaint if the same valuation is placed on his property for taxation purposes that he so persistently represented it to have when he wished to sell it to the Territory. Such a view is certainly in favor of public morality, if not of private virtue and common honesty.

It is clear to my mind that the rights and privileges owned by the tax-payer in the Pauoa Springs is of great value and that his lands as returned and approved by the Tax Court are not valued in excess of their true value, exclusive of his property in these springs, and that the assessor therefore had a right to assess the same, using the best information at his command, and that the valuation placed thereon, namely, $142,750, ought to be sustained.